ELI ENVIRONMENTAL CONTRACTORS, INC.,
Plaintiff-Respondent,

v.

435 PARTNERS, LLC, Defendant-Appellant.

Court of Appeals

*No. 2006AP1095. Submitted on briefs February 6, 2007.
—Decided March 13, 2007.*

2007 WI App 119

(Also reported in 731 N.W.2d 354.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Rodney W. Carter, J. Michael Long* and *John T. Domaszek* of *Murn & Martin, S.C.,* of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *John E. Machulak* and *Susan R. Robertson* of *Machulak, Robertson & Sodos, S.C.,* of Milwaukee.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. KESSLER, J. 435 Partners, LLC appeals from a judgment enforcing a promissory note it executed in favor of Eli Environmental Contractors, Inc. After trial to the court, the trial court found that reciprocal promises by Eli and 435 Partners were sufficient consideration to support the Note, and that 435 Partners had not sustained its burden of proof of lack of consideration by the clear and convincing evidence required to defeat the presumption of consideration which attaches to a negotiable instrument. We affirm.

*Background*

¶ 2. This dispute arises out of a real estate development project involving dilapidated buildings on land at 435 South Water Street in Milwaukee. The property was originally owned by Water Street Holdings, who negotiated the sale of an eighty-percent interest in the property to Icon. Water Street Holdings and Icon were to become members of 435 Partners, LLC, the defendant in this action. Before the sale could close, certain demolitions and remediation of environmental matters were necessary. Water Street Holdings contracted this work to Eli, who subcontracted much of the work. Water Street Holdings' owner and Eli's owner were

relatives.[1] Icon, for the most part, paid Eli and the subcontractors for their work, either directly or indirectly.

¶ 3.   As the closing date for the Water Street Holdings–Icon deal approached, Tom Jacobson, an official of Eli, and Michael Krill, general counsel of Icon, reviewed liens and other encumbrances on the property that needed to be resolved before title could be cleared. They were unable to resolve these matters. The closing was postponed, and Icon began negotiating with the lien claimants. Eventually Jacobson sent Krill a document entitled "Closing for Water Street" which detailed claims totaling $97,000, including a balance to Eli of $21,672.72. At the foot of that document, Eli proposed that 435 Partners give Eli a "Note to Eli @ 9%:   $50,000." The closing was finally held on February 5, 2003. Krill rejected the proposed note at closing.

¶ 4.   However, ultimately a promissory note in the face amount of $50,000 was signed, at Krill's recommendation, by Jeffrey P. Klement, an officer of Icon and the Managing Member of 435 Partners. The Note is undated beyond the caption of "February ___, 2003" and a preparation date of "2/14/03" in the lower margin of the Note. The trial court concluded that the Note was signed no earlier than February 14, 2003, and was not delivered at the closing. By the terms of the Note "[t]he principal balance and accumulated interest shall be due and payable in full on February 5, 2004." The Note was not paid when due, which prompted this litigation. 435 Partners contended that the Note was unenforceable

---

[1] Elizabeth Riley, who originally owned all of Eli, is the mother of Jacobson, who was a project manager or general manager of Eli at times material to this case. Water Street Holdings was owned by Tom Stone who is Elizabeth Riley's brother.

for lack of consideration, and alternatively alleged it was entitled to an offset against any amount that might be due because of 435 Partners' overpayments to Eli.

¶ 5.  The trial court, in a lengthy and thoughtful analysis of both parties' positions and competing testimony, made the following factual findings:

- [T]he note was issued by 435 Partners as a gesture of goodwill in anticipation of future work, as an assurance to Eli that 435 Partners and Eli would continue working together and that 435 Partners would continue to use Eli's services in the development of the real estate on Water Street, in short, as a down payment on future work.[2]

- [I]n exchange for 435 Partner's [sic] promise to pay, Eli promised to perform environmental services in the future if offered such work by 435 Partners. At the time these promises were exchanged, both parties

---

[2] In its Findings of Fact, the trial court set forth the four different explanations for signing the note which 435 Partners advanced at various times in the litigation:

a.  that the note was tendered in compromise of claims of Eli that were known and certain and unpaid at the time of the February 5 closing . . . .

b.  that the note was tendered in exchange for Eli's promise to account for and pay certain subcontractor claims for which Eli had been paid by Icon but which had not, in turn, been paid by Eli to the subcontractors . . . .

c.  that the note was tendered in tentative compromise of some unspecified claims of Eli that were not itemized at the time of the closing but that would be substantiated by Eli to the satisfaction of 435 Partners at some time after the promissory note was issued . . . . These charges have never been substantiated.

d.  that the note was tendered in pre-payment of environmental clean-up work to be done at some point after the closing ("in the future," so to speak) or merely to assure Eli of future work and secure Eli's willingness to perform such work in the future . . . .

expected that such work would need to be performed and in fact would be offered to Eli.

- 435 [Partners] was interested in maintaining a working relationship with Eli and . . . the note was issued . . . to assure Eli that such work would be made available to Eli. For this reason, Mr. Krill . . . recommended that Mr. Klement sign the note.

- Jacobson . . . and Mr. Krill brainstormed a variety of ideas to secure future work from 435 Partners for Eli. Before hitting upon the idea of a promissory note, the parties considered a mortgage and a personal guarantee . . . . Eli was qualified to perform the work and . . . its stake in future work had been established by the work it had been doing up to the date of the founding of 435 Partners.

- These particular measures, when viewed as a group, seem to indicate much more of a concern of parties who were intent upon guaranteeing future work than a concern of parties who were concerned about payment of some obligation hanging over from the past.

- The promissory note seem[s] to have been calculated as an assurance by 435 Partners that it would offer Eli at least $50,000 worth of work.

- [Based on the evidence,] I am not persuaded that 435 Partners has overpaid Eli.

¶ 6.   The trial court went on to analyze the issue before it as one involving the doctrine of bilateral promises, in which a promise of future performance is consideration for a return promise of future performance, and concluded that the Note in this case was enforceable because:

[A]t the time 435 Partners issued the note and Eli accepted it, both parties were reasonably confident that

work remained to be done on the Water Street property, that Eli would continue to do that work, that there was still business left to be done in their "little family."

[I]n a case of an exchange of promises, such as this case, the court need not wait until the promise has been performed to determine whether the promise constitutes consideration. The promise itself is consideration; the promise, not the performance, is the manifestation of the intent to be bound, and whether the promise is actually performed bears only on issues of breach and damages.

. . . .

[T]he facts of this case cannot support a finding that this promise was illusory . . . . Eli was clearly committed to performing future work at the Water Street property; the only thing potentially illusory about Eli's promise to perform future work was the possibility that 435 Partners would refuse to offer such work to Eli. Not only was that possibility not "entirely optional with the 'promisor' " that is, Eli, but it was that very contingency that the parties sought to lock up with the promissory note.

## Standard of Review

¶ 7. We sustain a trial court's findings of fact unless they are clearly erroneous. WIS. STAT. § 805.17(2) (2003–04).[3]

The drawing of an inference on undisputed facts when more than one inference is possible is a finding of fact which is binding upon the appellate court. It is not within the province of . . . any appellate court to choose

---

[3] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

718

not to accept an inference drawn by a factfinder when the inference drawn is a reasonable one.

*State v. Friday*, 147 Wis. 2d 359, 370–71, 434 N.W.2d 85 (1989). However, an appellate court can reject a clearly unreasonable inference. *Id.* at 371. "Whether consideration supports a contract presents a question of fact." *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 838, 520 N.W.2d 93 (Ct. App. 1994). We review a trial court's conclusions of law *de novo, First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977), and we must separate factual findings from conclusions of law and apply to each the appropriate standard of review, *Meyer v. Classified Ins. Corp.*, 179 Wis. 2d 386, 396, 507 N.W.2d 149 (Ct. App. 1993).

*Analysis*

¶ 8.    435 Partners appealed from an order and judgment that did two things. First, it enforced a $50,000 Promissory Note issued by 435 Partners to Eli. Second, it denied 435 Partners' claims for offsets against the Note. 435 Partners made no argument before this court on the subject of the offsets. Consequently, we deem that issue abandoned and that portion of the order and judgment relating to offsets is summarily affirmed. *See State v. Johnson*, 184 Wis. 2d 324, 344–45, 516 N.W.2d 463 (Ct. App. 1994) (an issue raised in the trial court but not briefed or argued on appeal is deemed abandoned).

¶ 9.    435 Partners contends that there was no consideration for the Note; hence the Note is not enforceable. "Consideration" is defined in Wis. Stat. § 403.303 as:

(2) "Consideration" means any consideration sufficient to support a simple contract. The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for a promise of performance, the issuer has a defense to the extent that performance of the promise is due and the promise has not been performed. If an instrument is issued for value as stated in sub. (1), the instrument is also issued for consideration.

In the case of a promissory note, which is a formal, archetypal manifestation of an intent to pay, consideration is, in fact, presumed. *Jax v. Jax*, 73 Wis. 2d 572, 586, 243 N.W.2d 831 (1976); *Estate of Schoenkerman*, 236 Wis. 311, 314, 294 N.W. 810 (1940). The burden of proving failure of consideration for a negotiable instrument is on the person asserting that failure and "such failure must be shown by clear and satisfactory evidence." *Jax*, 73 Wis. 2d at 586. "[C]onsideration exists if the parties manifest an intent to be bound to the contract." *Piaskoski & Assocs. v. Ricciardi*, 2004 WI App 152, ¶ 7, 275 Wis. 2d 650, 686 N.W.2d 675. Evidence of intent to be bound need not be substantial. *St. Norbert Coll. Found., Inc. v. McCormick*, 81 Wis. 2d 423, 430, 260 N.W.2d 776 (1978).

¶ 10.   435 Partners argues that the Note is unenforceable because there was no consideration. It argues, essentially, that the trial court was wrong on the law when it found consideration existed because:   (1) 435 Partners' promise was discretionary and illusory; (2) neither party here performed its promise, which left "the agreement" executory and thus unenforceable; and (3) the test of consideration must be at the time the promise is to be enforced, rather than at the time of the contract.

¶ 11.  In support of each argument, 435 Partners relies primarily on *First Wisconsin National Bank of Milwaukee v. Oby*, 52 Wis. 2d 1, 188 N.W.2d 454 (1971). That reliance is misplaced. *First Wisconsin* involved a couple who entered into a check credit agreement with the plaintiff bank. *Id.* at 3. Under this agreement, the bank provided blank checks the couple could use to write a check against the line of credit. *Id.* The couple promised to pay the bank, with interest described in the agreement, for any such checks the bank honored. *Id.* Neither the Obys nor the bank unconditionally promised either to borrow or to lend money, hence both had the right under the check credit agreement to do nothing. *Id.* at 7–8. The Obys incurred no payment obligations until the bank actually loaned money. *Id.* at 8.

¶ 12.  Mr. Oby wrote a number of checks, which the bank honored, but for which the couple did not pay the bank. *Id.* at 4. The bank sued both Mr. Oby and Mrs. Oby. *Id.* It obtained a default judgment against Mr. Oby. *Id.* Mrs. Oby, who had written no checks herself, defended on the grounds that she received no consideration when she signed the check credit agreement. *Id.* at 4–5. The court concluded that "the agreement at the time of its execution did not constitute a binding or enforceable contract *since neither party could compel the other to do anything.*" *Id.* at 8 (emphasis added). It is that language upon which 435 Partners substantially relies.

¶ 13.  In the present case, however, 435 Partners and Eli had immediate obligations:  Eli was obliged to perform work immediately if 435 Partners requested it, and 435 Partners immediately had an obligation to pay the Note according to its terms. Viewed conversely, 435

Partners could immediately compel Eli to perform environmental and demolition work and Eli could immediately hold 435 Partners to the terms of the Note. Unlike the completely *conditional* agreement in *First Wisconsin,* here in the written document is an *unconditional* negotiable instrument[4]—a promissory note—which Eli could have immediately sold to a third person; and, under which, after February 5, 2003, Eli could compel 435 Partners to pay. In *First Wisconsin,* the check credit agreement was not a negotiable instrument. Unlike in *First Wisconsin,* where neither the bank nor the Obys had an unconditional obligation until after the bank honored one of the credit checks, here, neither party could terminate the agreement at will.

¶ 14. The promise, which forms the consideration to 435 Partners to support the Note, is Eli's promise to

---

[4] WISCONSIN STAT. § 403.104 states, in relevant part:

**Negotiable instrument. (1)** Except as provided in subs. (3) and (4), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if all of the following apply:

(a) It is payable to bearer or to order at the time that it is issued or first comes into possession of a holder.

(b) It is payable on demand or at a definite time.

(c) It does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain any of the following:

1. An undertaking or power to give, maintain or protect collateral to secure payment.

2. An authorization or power to the holder to confess judgment or realize on or dispose of collateral.

3. A waiver of the benefit of any law intended for the advantage or protection of an obligor.

722

perform work if asked to do so by 435 Partners. The purpose of the Note, the trial court found, was not only to secure Eli's obligation to perform work, but also to secure 435 Partners' obligation to offer the work. The promises themselves, not their ultimate performance, were the consideration upon which the negotiable instrument—the Note—was based. As our supreme court noted in *Ferraro v. Koelsch*, 124 Wis. 2d 154, 368 N.W.2d 666 (1985): "It is black letter law that a promise for a promise, or the exchange of promises, will constitute consideration to support any contract of this bilateral nature."[5] *Id.* at 164. In *Ferraro*, the court relied upon the exchange of promises in an employee handbook, distributed by the employer after employment commenced, to create a binding contract between the employer and employee. *Id.* at 167. The handbook evidenced bilateral promises which each agreed to perform. *Id.* at 165–66. Those bilateral promises made the terms of the handbook enforceable by the employee against the employer. *Id.* at 165.

¶ 15.   The same rules apply here. The promises which the trial court found constituted consideration for the Note were bilateral promises. Both Eli and 435 Partners benefited from the reciprocal promises to perform, and assurance of, future work. The Note was the guarantee to Eli that future work would be forthcoming. Business entities, even those involving family members, do not generally issue and deliver valuable

---

[5] The court in *Ferraro v. Koelsch*, 124 Wis. 2d 154, 368 N.W.2d 666 (1985), cited *First Wisconsin National Bank of Milwaukee v. Oby*, 52 Wis. 2d 1, 7, 188 N.W.2d 454 (1971), as support for the black letter rule about bilateral promises as sufficient consideration to support a contract. *Ferraro*, 124 Wis. 2d at 164.

negotiable instruments to another business for no reason. 435 Partners advanced numerous explanations for the Note which the trial court found were either unpersuasive or not credible. Likewise, the trial court found that 435 Partners had failed to establish by clear and convincing evidence that the Note lacked consideration. We agree.

¶ 16.    Finally, 435 Partners argues that the time at which consideration must be measured is the moment of performance, not the moment in which the contract is made. Thus, 435 Partners argues, because Eli's promise to do work was never performed, 435 Partners has received no consideration and is not bound by the Note. Again, 435 Partners erroneously relies on *First Wisconsin* in support of this theory. As we have explained, the check credit agreement in *First Wisconsin* had no reciprocity of obligation until each party chose to do something it had no obligation to do. *Id.*, 52 Wis. 2d at 7–8. Here, however, Eli had an immediate obligation to do work if 435 Partners asked them to do so, and 435 Partners had an immediate obligation to offer Eli work and to honor the terms of the Note. The immediacy and unconditional nature of these obligations remove this case from the realm of illusory unenforceable promises.

*By the Court.*—Judgment and order affirmed.